# United States Court of Appeals
## For the First Circuit

---

No. 26-1217

STATE OF WASHINGTON; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR, ex rel. ANDY BESHEAR, in the official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; GOVERNOR JOSH SHAPIRO, in the official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF VERMONT; STATE OF WISCONSIN,

Plaintiffs, Appellees,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of the United States Department of Housing and Urban Development,

Defendants, Appellants.

---

No. 26-1218

NATIONAL ALLIANCE TO END HOMELESSNESS; NATIONAL LOW INCOME HOUSING COALITION; CROSSROADS RHODE ISLAND; YOUTH PRIDE, INC.; CITY OF BOSTON; CITY OF CAMBRIDGE; MARTIN LUTHER KING, JR. COUNTY; METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY; COUNTY OF SANTA CLARA; CITY AND COUNTY OF SAN FRANCISCO; CITY OF TUCSON,

Plaintiffs, Appellees,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of the United States Department of Housing and Urban Development,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

---

Before

Gelpí, Montecalvo, and Rikelman,
Circuit Judges.

---

Brett A. Shumate, Assistant Attorney General, Yaakov M. Roth, Principal Deputy Assistant Attorney General, Daniel Tenny, and Sarah Clark Griffin, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, on brief for appellants.

Nicholas W. Brown, Attorney General of Washington, Andrew R.W. Hughes, Zane Muller, Aliana Knoepfler, Andrea Alegrett, Assistant Attorneys General, Cristina Sepe, Deputy Solicitor General, Letitia James, Attorney General of New York, Barbara D. Underwood, Solicitor General, Judith N. Vale, Deputy Solicitor General, Peter F. Neronha, Attorney General of Rhode Island, Kathryn M. Sabatini, Special Assistant Attorney General, Jordan G. Mickman, Assistant Attorney General, Leonard Giarrano IV, Special Assistant Attorney General, Kristin K. Mayes, Attorney General of Arizona, Hayleigh S. Crawford, Deputy Solicitor General, William Y. Durbin, Senior Litigation Counsel, Rob Bonta, Attorney General of California, Jarrell Mitchell, Deputy Attorney General, Michael L. Newman, Senior Assistant Attorney General, Joel Marrero, Supervising Deputy Attorney General, Brian Bilford, Lauren Greenawalt, Deputy Attorneys General, Philip J. Weiser, Attorney General of Colorado, David Moskowitz, Deputy Solicitor General, Nora Passamaneck, Senior Assistant Attorney General, William Tong, Attorney General of Connecticut, Andrew M. Ammirati, Assistant Attorney General, Brian L. Schwalb, Attorney General of District of Columbia, Caroline S. Van Zile, Solicitor General, Dia Rasinariu, Assistant Attorney General, Kathleen Jennings, Attorney General of Delaware, Ian R. Liston, Director of Impact Litigation,

Vanessa L. Kassab, Deputy Attorney General, Rose Gibson, Assistant Attorney General, Andy Beshear, Governor of Kentucky, S. Travis Mayo, General Counsel, Taylor Payne, Chief Deputy General Counsel, Laura C. Tipton, Deputy General Counsel, Kwame Raoul, Attorney General of Illinois, Alex Hemmer, Deputy Solicitor General, Aaron M. Frey, Attorney General of Maine, Katherine W. Thompson, Special Counsel, Anthony G. Brown, Attorney General of Maryland, James C. Luh, Senior Assistant Attorney General, Dana Nessel, Attorney General of Michigan, Neil Giovanatti, Assistant Attorney General, Andrea Joy Campbell, Attorney General of Massachusetts, Katherine Dirks, Chief State Trial Counsel, Michelle Pascucci, Nita Klunder, State Trial Counsel, Esme Caramello, Director, Housing Affordability Unit, Aaron Dulles, Lauren Yamaguchi, Assistant Attorneys General, Keith Ellison, Attorney General of Minnesota, Brian S. Carter, Special Counsel, Jennifer Davenport, Attorney General of New Jersey, Daniel Resler, Deputy Attorney General, Dan Rayfield, Attorney General of Oregon, Scott P. Kennedy, Senior Assistant Attorney General, Raúl Torrez, Attorney General of New Mexico, Anjana Samant, Deputy Counsel, Jennifer C. Selber, General Counsel to the Governor of the Commonwealth of Pennsylvania, Jacob B. Boyer, Stephen R. Kovatis, Deputy General Counsel, Charity R. Clark, Attorney General of Vermont, Samuel B. Stratton, Assistant Attorney General, Joshua L. Kaul, Attorney General of Wisconsin, Faye B. Hipsman, Assistant Attorney General, on brief for appellees State of Washington, et al.

Amy R. Romero, Kevin Love Hubbard, DeLuca, Weizenbaum, Barry & Revens, Ltd., Kristin Bateman, Simon C. Brewer, Madeline H. Gitomer, Carrie Y. Flaxman, Aleshadye Getachew, Aman T. George, Christine L. Coogle, Yenisey Rodríguez, Robin Thurston, Democracy Forward Foundation, Tony LoPresti, County Counsel, Kavita Narayan, Chief Assistant County Counsel, Meredith A. Johnson, Lead Deputy County Counsel, Stefanie Wilson, Deputy County Counsel, Leily Arzy, Litigation Fellow, David Chiu, City Attorney, Yvonne R. Meré, Chief Deputy City Attorney, Mollie M. Lee, Chief of Strategic Advocacy, Sara J. Eisenberg, Chief of Complex and Affirmative Litigation, Ronald H. Lee, Assistant Chief of Complex and Affirmative Litigation, Michael Levin Gesundheit, Deputy City Attorney, Lynette Labinger, Antonia K. Fasanelli, Kathryn M. Scott, National Homelessness Law Center, Wallace W. Dietz, Director of Law, John K. Whitaker, Senior Counsel, Abby Greer, Assistant Metropolitan Attorney, David J. Hackett, General Counsel, King County Department of Local Services, Christopher M. Sanders, General Counsel to the King County Executive, Cristy J. Craig, Senior Deputy Prosecuting Attorney, Toby Merrill, Cassandra Crawford, Graham Provost, Kayla Svihovec, and Public Rights Project on brief for appellees National Alliance to End

Homelessness, et al.

April 1, 2026

**RIKELMAN**, **Circuit Judge**. To assist homeless individuals and families in the United States, Congress authorized the Continuum of Care (CoC) program in 2009. Under that program, the Department of Housing and Urban Development (HUD) distributes funds each year to state and local entities to provide housing for millions of residents, including children, the elderly, and domestic-violence survivors. For years, consistent with Congress's intent, HUD administered the CoC program to ensure continuity and stable access to housing for the people it served.

In November 2025, HUD made sudden and dramatic changes to the CoC program. Those changes put hundreds of housing projects at risk of losing funding within just weeks, leaving the thousands of individuals and families who rely on that funding to once again face homelessness during the coming winter. Two groups of plaintiffs sued to challenge HUD's actions, and the district court granted their requests for preliminary injunctions. Importantly, HUD chose not to appeal those orders. Instead, two months later, it moved to dissolve the injunctions in light of Congress's 2026 appropriations law. After the district court denied that motion, HUD appealed and now requests an emergency stay pending appeal. Although the facts and procedural history of this case are complicated, the decisive issue before us is narrow: Has HUD made a strong showing that the district court overlooked some significant change in law or fact and thus abused its discretion

in denying the motion to dissolve? We conclude that HUD has not met that burden and thus is not entitled to the extraordinary relief of a stay.

## I. BACKGROUND

Because this case's unique procedural history is critical to understanding the legal issues, we provide an unusually detailed account of the facts and travel of the case.

### A. The Continuum of Care Program

In 1987, Congress enacted the McKinney-Vento Homeless Assistance Act (MVA) to address the "immediate and unprecedented crisis" of homelessness facing the Nation. 42 U.S.C. § 11301(a)(1). The statute served as the first comprehensive federal law designed to reduce homelessness, and it still provides the key legal architecture for HUD's homeless-assistance programs.

Under the MVA, Congress committed to "provid[ing] funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." Id. § 11301(b)(3). In 2009, Congress amended and reauthorized the MVA to modernize and streamline the Nation's approach to homelessness. See id. §§ 11381-11388.

As part of the 2009 changes to the MVA, Congress codified the CoC program to support "nonprofit providers and State and local governments [in] quickly rehous[ing] homeless individuals and

families while minimizing the trauma and dislocation caused . . . by homelessness." Id. § 11381(2). Ever since, HUD has followed a "Housing First" approach to combat homelessness.[1] Formally adopted by HUD during the administration of President George W. Bush, Housing First describes a set of principles that prioritize access to supportive services and housing -- particularly permanent housing -- without mandatory preconditions (such as sobriety). This approach has proven effective: One study shows that Housing First programs decreased homelessness in a sample set of communities by 88 percent, far outpacing alternative "Treatment First" strategies, which require participants to be treated for underlying conditions before receiving permanent housing. For that reason, Housing First has stood as a cornerstone of the CoC program, promoting continuity in housing and services through no-strings-attached, long-term homeless-assistance solutions. See id. §§ 11381, 11386b.

Under the CoC program, HUD awards grants to local coalitions -- known as "Continuums" -- to "carry out projects that serve homeless individuals or families." Id. § 11383(a). Qualifying projects include permanent-housing developments, rental-assistance programs, and rehousing services, to name a few.

[1] The Housing First model is evidence-based, with studies consistently showing that people are more likely to maintain their housing and avoid a return to homelessness when they live in a Housing First facility.

See id. Congress has identified certain "proven strategies" for HUD to prioritize in selecting projects for funding, such as permanent housing and rapid-rehousing services.[2] Id. § 11386b(d). HUD may identify and fund other effective strategies, but it may do so only "based on research and after notice and comment to the public." Id. § 11386b(d)(2)(C).

As of 2025, the CoC program funded nearly 7,000 projects, with approximately 87 percent of that funding dedicated to permanent housing. These projects, in turn, served the most vulnerable members of the community. For example, one Continuum in Massachusetts reported that 25 percent of its residents were families, 42 percent were elderly, 24 percent were survivors of domestic violence, 79 percent had a mental-health disability, and 36 percent had a physical disability.

Each year, Congress appropriates funds for HUD to distribute under the CoC program. See, e.g., Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4,

---

[2] "Permanent housing" encompasses programs aimed at swiftly and safely rehousing individuals experiencing homelessness. For example, rapid rehousing (RRH) assists individuals who have become homeless to obtain new housing quickly, often assisting with "short or medium-term rental assistance." Meanwhile, permanent supportive housing (PSH) supports individuals who have experienced "long-term or repeated homelessness" -- including individuals with disabilities, chronic illnesses, and mental-health conditions. The plaintiffs note that PSH "end[s] homelessness" for these "high-need populations" and decreases costs for their communities by, for example, reducing the need for emergency health care.

§ 1101(a)(12), (c), 139 Stat. 9, 12; see also Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 362. Relying on a competitive process, HUD then awards CoC funds to Continuums, each of which represents a geographic area, such as a county or group of counties.

HUD's grant selection process is guided by criteria set out by Congress in the MVA, including "the previous performance of the recipient regarding homelessness"[3] and the recipient's use of "comprehensive strategies for reducing homelessness." 42 U.S.C. § 11386a(b)(1). The MVA also directs HUD to perform certain calculations during the awards process. For example, HUD must determine "the need within the geographic area for homeless services" based on a formula it has established. Id. § 11386a(b)(2). The MVA also provides for the "renewal of contracts" for permanent-housing projects if "there is a demonstrated need for the project" and "the project complies with program requirements." Id. § 11386c(b). The CoC program's emphasis on renewals allows for the continuity necessary for Continuums to avoid funding gaps, which would otherwise disrupt

[3] A funding recipient's past performance addressing homelessness is measured by several factors, such as its success in reducing the number of individuals and families experiencing homelessness, preventing homelessness in the first instance, and minimizing returns to homelessness. See 42 U.S.C. § 11386a(b)(1).

their ability to provide stable housing, leverage funding from other sources, and plan long-term projects.

HUD administers the grant application and selection process through a Notice of Funding Opportunity (NOFO), which outlines the criteria and deadlines for awards selection. Once HUD issues its NOFO, which the MVA instructs it must do no "later than 3 months after" Congress passes its annual appropriations bill, the application process begins. Id. § 11382(b). Responding to a NOFO is no small feat because Continuums must implement local competitions to determine which projects they will include in their applications to HUD, ranked in order of priority. Generally, HUD sets an application deadline for 90 days after it issues a NOFO. Standard grants cover a period of 12 months and are typically awarded by early January, with renewals beginning the day after the previous grant expires. HUD has operated according to this schedule for years with only slight variations, such as issuing a NOFO one month after the MVA's three-month deadline or awarding funds in the middle or end of January.

**B. The 24-25 NOFO**

In March 2024, Congress authorized HUD to issue a single two-year NOFO for fiscal years 2024 and 2025 in order to streamline the application process and reduce the administrative burden on local Continuums. See § 242, 138 Stat. at 386. This authorization

applied to funds that would be appropriated by Congress in 2024 and 2025. See id.

In response, HUD released a NOFO (the "24-25 NOFO") inviting applications by October 2024 and indicating that a single application could be submitted for both 2024 and 2025. In the NOFO, HUD committed to evaluating awarded projects for renewal in 2025 under the previously submitted application (contingent on congressional appropriations for that year). If, however, a Continuum sought to "reallocate eligible renewal projects and create new projects" in 2025, then it would need to submit a new application by August 2025. HUD reserved the right to "modify this NOFO or issue a supplemental . . . NOFO if necessary," for example, if it needed "to accommodate a new CoC or . . . priority or new funding source."

On March 15, 2025, Congress appropriated new funds for the CoC program. See § 1101(a)(12), 139 Stat. at 10, 12. Because the 24-25 NOFO was already in place, HUD was not required to issue a new NOFO, but if it wanted to, the MVA instructed it to do so within three months, or by June 15, 2025. See 42 U.S.C. § 11382(b). HUD did not issue a new 2025 NOFO by that deadline. Instead, on July 3, 2025, HUD announced via email that it "intend[ed] to publish a NOFO for 2025 [CoC] awards," "recogniz[ing] [that] this [was] a new application process for

2025 funding." The notice did not state when HUD would issue the new NOFO and provided only a hint about its expected contents.

**C. The November NOFO**

On November 13, 2025 -- five months after the statutory deadline to issue a 2025 NOFO expired -- HUD released a new NOFO (the "November NOFO"), which "rescind[ed] and supersede[d] any mention of awards of [fiscal year] 2025 CoC funds" under the 24-25 NOFO.

The November NOFO marked a stark departure from the 24-25 NOFO and longstanding HUD policy. The biggest shift came from HUD's abrupt deviation from its decades-long Housing First approach to homelessness. Most significantly, HUD reduced the amount of funding available for "Tier 1" projects, most of which are permanent-housing projects. Typically, Tier 1 projects are the "most critical to meeting community needs" and benefit from regular, noncompetitive renewals. The November NOFO capped the Tier 1 renewal rate at 30 percent, compared to 90 percent in the 24-25 NOFO, despite the MVA's express prioritization of permanent-housing renewal funding. See, e.g., 42 U.S.C. §§ 11386a(b), 11386b(d). According to one housing agency, the 30 percent Tier 1 cap, if implemented, would "eliminate[] a vast majority of permanent housing projects" and "reverse[] over 20 years of consistent renewal funding" for projects that house people at chronic risk of homelessness. In another about-face, the

November NOFO added eligibility criteria that would require certain residents to enroll in services for substance-abuse treatment in order to access housing. Multiple Continuums reported that these conditions (and several others), taken together, threatened a "cascading crisis" to the availability of stable housing for vulnerable populations.

Despite the drastic changes to the CoC program requirements and model, the November NOFO set an application deadline of January 14, 2026 -- just 62 days after its publication. At the same time, the NOFO indicated that HUD did not plan to disburse funds under the NOFO until May 2026.

The record reveals that this timeline created chaos for the Continuums. Most critically, the timeline guaranteed funding gaps for Tier 1 housing projects that had been expecting renewals of funding otherwise set to expire in the early months of 2026. One nonprofit in Rhode Island identified multiple permanent-housing projects in its portfolio, which supported hundreds of previously homeless individuals, that would lose funding on January 1. It stated unequivocally that if it did not receive its CoC funding on time, people "w[ould] lose their housing and associated supportive services . . . lead[ing] to an increase in homelessness." A shelter in Tennessee that served nearly 400 people faced a similar dilemma, with its funding also set to expire

in January 2026. It reported that, without CoC funding, its residents would be forced back into homelessness during the winter.

The record also indicates that meeting the shortened application deadline in the November NOFO was itself "virtually impossible." With only two months to run local competitions and submit applications, Continuums scrambled to meet the condensed timeline under a radically different set of guidelines. Several Continuums were forced at the last minute to divert resources and staff from their primary work -- reducing homelessness -- to attempt to complete the application process. Altogether, the November NOFO led Continuums and state officials to anticipate alarming increases in homelessness in the coming months.

### D. The Lawsuits

Less than two weeks after the November NOFO's release, 21 states and the District of Columbia sued HUD and its Secretary.[4] Seven local governments and four nonprofit entities filed a separate suit the next week.[5] The plaintiffs in the two lawsuits alleged that HUD's decisions to rescind the 24-25 NOFO and implement the November NOFO violated the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), and various provisions of the U.S.

---

[4] For the remainder of this opinion, we refer to HUD and its Secretary collectively as "HUD."

[5] Although the cases have not been consolidated, they have proceeded together in the district court.

Constitution.[6] Specifically, they challenged certain conditions in the November NOFO that were not in the 24-25 NOFO, including the 30-percent cap on Tier 1 funding and wholesale departure from the Housing First approach.

With severe funding gaps just weeks away, the plaintiffs sought immediate injunctive relief. They requested an order that would prohibit HUD from rescinding the 24-25 NOFO or giving effect to the November NOFO; they also asked the district court to direct HUD to process applications according to the 24-25 NOFO.

**E. The TRO Hearing**

The district court scheduled a hearing for a temporary restraining order (TRO) on December 8, 2025. One hour before the hearing, HUD issued a notice that it had "withdrawn the challenged November [NOFO] . . . in order to assess the issues raised by [the plaintiffs] in their [law]suits and to fashion a revised NOFO." On that basis, HUD maintained that the plaintiffs' request for a TRO was "now moot." Nevertheless, HUD made clear "its intention to issue a new NOFO" for 2025, which it argued the plaintiffs could challenge after its publication. Because the rescission of the November NOFO mitigated the need for a TRO, the court directed the parties to proceed to litigating the preliminary injunction motion

[6] The plaintiffs claimed, for example, that HUD violated the APA by taking agency action that was unlawful, arbitrary and capricious, and procedurally defective.

without a TRO. With the parties' input, the court set a briefing schedule and a hearing on the motion for December 19 at 10:00 A.M.

**F. The Preliminary Injunction Briefs and Hearing**

In opposing the plaintiffs' preliminary injunction motions, HUD continued to lean heavily on its mootness argument. It recognized, however, that any challenges to conditions "reimposed later would [not] be moot," although it did not provide details about the substance of any new NOFO. Instead, HUD remained noncommittal, leaving open the possibility "that the forthcoming NOFO [may] include any of the same (or similar) conditions that appeared in the withdrawn [November] NOFO." And notably, HUD did not address the merits of the plaintiffs' arguments about the illegality of the challenged conditions in the November NOFO; rather, it rested on its mootness argument.[7]

In reply, the plaintiffs argued that HUD's rescission of the November NOFO amounted to a "litigation tactic rather than an internal rethinking about the legality of the challenged directive." Thus, the plaintiffs maintained that the voluntary cessation doctrine applied and their cases were not moot.[8]

---

[7] With its brief, HUD filed a five-page "administrative record" consisting of a limited set of public documents about the November NOFO and forthcoming NOFO.

[8] HUD's public website indicated that it had rescinded the November NOFO, but HUD expressly reserved the right "to exercise [its] discretion and make changes to the previously issued CoC NOFO to account for new priorities."

As to the equities, the plaintiffs argued that allowing HUD's rescission of the 24-25 NOFO to stand would cause them irreparable harm by guaranteeing funding gaps, which would then lead to people "los[ing] housing and related services." In support of these arguments, the plaintiffs submitted numerous declarations, which HUD never contested. As one nonprofit organization reported in its declaration, a funding gap would force "residents who are now stably housed [to] be responsible for paying 100[ percent] of the rental cost," which, for "the very low-income population [it] serve[s]," would "not [be] feasible." Others reported that a funding gap would cause certain permanent-housing programs to shut down, necessary rehousing and health-support services to be cut, and essential personnel to be terminated. In turn, rates of eviction and homelessness would likely spike.

According to the plaintiffs' unrebutted evidence, even the mere threat of a funding gap had already imposed serious real-world harm: One housing-support organization reported in early December that it had "stopped referring new clients to certain permanent housing programs funded by [CoC] grants because of the planned [funding] cuts." And multiple Continuums similarly "stopped accepting referrals" at the end of last year on the chance that they would "lose funding."

As of 10:00 A.M. on December 19, the time set for the preliminary injunction hearing, HUD had not issued a new NOFO. At

the hearing, the district court asked for a status update; although HUD did not commit to a deadline, it shared that it expected that the new NOFO would be "published by close of business" that day. With that timing in mind, HUD argued that the court should give it "another chance" to issue the new NOFO rather than subject it to a preliminary injunction reinstating the 24-25 NOFO.

The district court raised several concerns with HUD's position. First, given that HUD had waived any argument "about the substance" of the November NOFO, the court sought to verify that none of the challenged conditions would carry over into the new NOFO. HUD equivocated and stated only that it "c[ouldn't] speak to what the new conditions" would be. Second, the court asked how HUD intended to manage the interim period to avoid the imminent funding gaps. HUD again equivocated, maintaining that it "c[ouldn't] make any representations . . . about what [it] [was] or [was] not willing to do," other than it would not "be willing to . . . operate under the [24-25] NOFO." And finally, the court raised its concern that HUD had "strategic[ally]" timed its release of the new NOFO to be after the agreed-upon preliminary injunction hearing in an effort to "evad[e] the [c]ourt's jurisdiction" and simply "issue the exact same NOFO again." HUD offered only that it was "working diligently."

Between HUD's lack of clarity on the timing and content of any new NOFO, and the looming January funding gaps just days

away, the district court concluded that it had to proceed to a decision. In issuing its oral ruling, the court began by rejecting HUD's mootness argument, concluding that its rescission of the November NOFO constituted "a classic voluntary cessation scenario." The court found that HUD had failed to prove that the challenged conduct would not recur and instead had doubled down and "expressly reserve[d] the right to re-issue the same or [a] similar" NOFO.

The district court then moved to the merits, concluding that the plaintiffs were likely to succeed on their claims that HUD had violated the APA. First, the court held that the rescission of the 24-25 NOFO and release of the November NOFO likely exceeded HUD's statutory authority under the MVA and was likely contrary to federal law. For example, the court determined that HUD likely had contravened multiple provisions in the MVA, including its "prioritization of permanent housing and renewal stability" and "formula-based allocations scheme." Relatedly, the court reiterated that the November NOFO failed to meet the three-month statutory deadline for issuing NOFOs set out in the MVA. Second, the court determined that HUD's actions were likely arbitrary and capricious, as HUD had departed from longstanding policy without explanation, failed to consider significant reliance interests of the plaintiffs and the people whom they serve, and adopted sweeping new grant conditions without notice

and comment. As the court noted, although HUD "is entitled to [change] its policies," it cannot do so in ways that violate federal law, including statutes enacted by Congress.

The district court also ruled that HUD's actions would cause irreparable harm to the plaintiffs, based on the plaintiffs' unrebutted declarations. Specifically, it found that the withdrawal of the 24-25 NOFO, coupled with the delayed processing of renewals, "guarantee[d] funding gaps" that "concrete[ly] . . . harm[ed]" the plaintiffs. Finally, the court concluded that the balance of equities and the public interest "strongly favor[ed] temporary relief" because "[e]nsuring lawful agency action, continuity of housing, and stability for vulnerable populations . . . clearly [is] in the public interest." For these reasons, the court orally enjoined HUD from rescinding the 24-25 NOFO and directed it to "maintain [the] status quo unless and until . . . a lawful NOFO . . . is substituted."

At the close of the hearing, the district court indicated that, "depending on what the new NOFO . . . does," it would issue a written order memorializing its oral ruling.

### G. The December NOFO

Near midnight that night, on December 19, HUD issued a new NOFO (the "December NOFO"). Although the December NOFO modified some aspects of the rescinded November NOFO, it carried forward several of the challenged conditions. For example, it

continued to cap Tier 1 funding at 30 percent. It also continued to reject the Housing First approach.

The December NOFO set out a two-track application process with different, but compressed, deadlines. Applications under the "Normal Track" were due by January 28, 2026 -- just 40 days later (compared to the 62 days ostensibly afforded by the November NOFO and the 90 days historically provided).[9] Meanwhile, "Extended Track" applications, which applied only to new permanent-housing projects, were due by February 25, 2026. The December NOFO also included a caveat that, because of the district court's oral preliminary injunction ruling, HUD would "not implement or enforce [it] pending further court order."

**H. The Written Preliminary Injunction Orders**

On December 23, four days after HUD published the December NOFO, the district court issued its written preliminary injunction orders. The orders reiterated that HUD was enjoined from rescinding the 24-25 NOFO and implementing the challenged conditions in the November NOFO. Section 5 of the orders also enjoined HUD from "giving effect to any existing or forthcoming agency action to further rescind or replace the [24-25] NOFO." HUD has consistently conceded that Section 5 applies to the

[9] The Normal Track application process governed all applications for new and renewal projects except for new permanent housing projects, which were subject to the Extended Track.

December NOFO. Finally, the orders directed HUD to "preserve the status quo ante that existed under the [24-25] NOFO, including by taking all steps necessary to process eligible renewals for [fiscal year] 2025 CoC funding pursuant to [that] NOFO."

HUD did not appeal the district court's preliminary injunction orders, and its deadline to do so expired on February 23, 2026. See Fed. R. App. P. 4(a)(1)(B). The parties instead proceeded towards summary judgment under an expedited schedule, focusing on the rescission of the 24-25 NOFO and the December NOFO.

**I. THUD**

On February 3, 2026, the President signed the Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026 (THUD) into law. See Pub. L. No. 119-75, 140 Stat. 173, 323-437 (2026). In Section 244 of the statute, Congress set out a structure for awarding CoC funds that would avoid funding gaps. First, it directed HUD to renew on a noncompetitive basis all CoC projects expiring in the first quarter of calendar year 2026 "prior to awarding any amounts through a [new] [NOFO]." Id. § 244, 140 Stat. at 422. Second, it provided that "if awards have not been made under a fiscal year 2025 [NOFO] prior to April 1, 2026," HUD must renew on a noncompetitive basis all projects set to expire in the second quarter of 2026. Id. And finally, Congress directed that if HUD had not awarded funding pursuant to "a fiscal year 2025 [NOFO] prior to July 1, 2026,"

then HUD must provide noncompetitive funding renewals to projects expiring in the third and fourth quarters of 2026. Id. § 244, 140 Stat. at 422-23.

In a separate part of the statute, THUD appropriated more than $4 billion in new funds for the CoC program to be "award[ed] . . . not later than December 1, 2026," and disbursed in 2027. 140 Stat. at 400. It also directed HUD to "issue the [NOFO] for the [new] amounts made available [for the CoC program] not later than June 1, 2026." Id. And it provided for a Tier 1 renewal cap of "not less than 60 percent" under the 2026 NOFO. Id. at 399 (emphasis added).

**J. The Motions to Dissolve and Stay Pending Appeal**

Two weeks later, on February 17, 2026, HUD moved to dissolve the preliminary injunctions. It pointed to THUD as the changed circumstance justifying its request. HUD argued primarily that the statute eliminated any threat of immediate, irreparable harm to the plaintiffs because it effectively provided for noncompetitive grant renewals through June 2026. With the threat of irreparable harm to the plaintiffs erased, HUD contended, there was no basis for the preliminary injunctions to continue. HUD also claimed that THUD "provide[d] . . . support for two of [its] merits arguments." First, according to HUD, the statute authorized it to award CoC funds under a 2025 NOFO "modified or issued later than [the] June 15, 2025" statutory deadline in the MVA. Second,

it asserted that THUD reaffirmed its "discretion under the [MVA] to reduce the number of CoC projects that will be noncompetitively renewed on a yearly basis." Thus, it argued, THUD had undermined the plaintiffs' arguments on these two legal issues.

The district court denied the motion to dissolve. As it explained, notwithstanding THUD, the plaintiffs would continue to face imminent, irreparable harm if HUD were permitted to implement the December NOFO while the case proceeded, including from "the upheaval and service gaps that would result from . . . overhaul[ing] the funding selection criteria on an accelerated basis." And based on its "prior determination" about the legality of the December NOFO, the court concluded that the plaintiffs continued to be likely to succeed on the merits of their claims.

HUD timely appealed the denial of its motion to dissolve. After the district court declined to issue a stay pending appeal, HUD moved for a stay from our Court, requesting that we stay the underlying preliminary injunction orders.

## II. STANDARD OF REVIEW

"A stay is an intrusion into the ordinary processes of administration and judicial review" and is not granted as "a matter of right." Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted). As the party seeking a stay, HUD bears the burden of demonstrating that it is entitled to

this "extraordinary remedy" under Nken's familiar four-factor test. Id. at 437 (Kennedy, J., concurring).

To satisfy the Nken test, HUD must (1) make "a strong showing that [it] is likely to succeed on the merits" of its appeal and also show that (2) it "will be irreparably injured absent a stay"; (3) the "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) "the public interest lies" with it, not the plaintiffs. Id. at 434. The first two factors "are the most critical." Id. Under the fourth factor, we consider the interests of the public in general, including people affected by homelessness, not just the interests of the parties. See New Jersey v. Trump, 131 F.4th 27, 41 (1st Cir. 2025); see also Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (exploring "the relative harms to applicant and respondent, as well as the interests of the public at large" (quoting Barnes v. E-Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers))).

## III. DISCUSSION

We begin by detailing what is -- and more importantly, what is not -- at issue in this appeal.

### A. Scope of the Appeal

HUD's appeal is limited. We are not evaluating the district court's underlying preliminary injunction orders. HUD

did not appeal those orders and thus they are not before us. The law is clear on this point: When a party chooses not to appeal an order granting an injunction, it may not smuggle an appeal of that order into its appeal of a decision denying a motion to dissolve that injunction. See Karnoski v. Trump, 926 F.3d 1180, 1198 (9th Cir. 2019) (stating that a party may not "regain its lost opportunity" to appeal an injunction by moving to dissolve the injunction and then appealing its denial (quoting Gon v. First State Ins. Co., 871 F.2d 863, 866 (9th Cir. 1989))); see also Hoult v. Hoult, 373 F.3d 47, 53 (1st Cir. 2004) (explaining that "the propriety of the original [preliminary injunction] order" was "beyond the scope of our review" of a motion to modify that injunction (quoting 16 Wright & Miller's Federal Practice & Procedure § 3924.2 (3d ed. 2025))). Otherwise, a party could leverage the appeal to "resurrect [its] expired time" to challenge the preliminary injunction itself. 16 Wright & Miller, supra, § 3924.2.

Turning to the motion to dissolve, it was HUD's obligation to demonstrate to the district court that an intervening change in fact or law "warrant[ed] the discontinuation" of the preliminary injunctions. Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo, 551 F.3d 10, 16 (1st Cir. 2008) (quoting Sprint Commc'ns Co. v. CAT Commc'ns Int'l, Inc., 335 F.3d 235, 242 (3d Cir. 2003)). Thus, in ruling on HUD's request for a stay, we

must evaluate the district court's denial of the motion to dissolve in light of "the new material" that HUD presented to demonstrate a change in circumstances. Karnoski, 926 F.3d at 1198 (quoting Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000)); see also Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1225 (1st Cir. 1994) (explaining that, in deciding whether to grant a motion to dissolve a preliminary injunction, a district court should consider new evidence that emerged after its original order to determine whether it affects the four-prong preliminary injunction analysis).

That means that we may not consider one of HUD's primary arguments in its stay motion to us: that the district court did not "adjudicate[]" or sufficiently "analy[ze]" the lawfulness of the December NOFO in its written preliminary injunction orders. This argument squarely attacks the underlying orders and has nothing to do with any intervening change in law or facts between December 23, when the district court issued the orders, and February 17, when HUD filed its motion to dissolve the injunctions. See Karnoski, 926 F.3d at 1198; Pérez-Perdomo, 551 F.3d at 16.

If HUD believed that the district court did not sufficiently analyze the December NOFO in the written preliminary injunction orders, it could have moved the district court to reconsider or clarify those orders. It also could have appealed them. HUD did neither, even though it conceded from the get-go

that Section 5 of the orders applied to the December NOFO. Because HUD's argument about the alleged inadequacy of the orders is not based on any "new material" or intervening change in law or facts, it is not properly before us in this appeal. Karnoski, 926 F.3d at 1198 (quoting Sharp, 233 F.3d at 1170).

There is one more reason why we cannot consider HUD's argument about the insufficiency of the December 23 preliminary injunction orders in evaluating its stay request: HUD has waived it. HUD did not make this argument to the district court in its motion to dissolve, despite the fact that it consistently acknowledged that the orders applied to the December NOFO. And as we have held many times, a party seeking to overturn a district court's order cannot do so based on arguments that it debuts for the first time on appeal. See, e.g., Cámara de Mercadeo, Industria y Distribución de Alimentos, Inc. v. Emanuelli-Hernández, 72 F.4th 361, 364-65 (1st Cir. 2023).

With that framing in place, we proceed to analyze the four prongs of the Nken test for a stay pending appeal.

**B. Likelihood of Success on the Merits**

To satisfy the first Nken factor, HUD must make a "strong showing" that it is likely to succeed on the merits of its appeal by establishing that the district court abused its discretion in denying its motion to dissolve. 556 U.S. at 434 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)); see Pérez-Perdomo, 551

F.3d at 15 ("We review a district court's decision to dissolve a preliminary injunction for abuse of discretion."). And that requires convincing us that HUD identified a "significant change in facts or law" that should have led the district court to dissolve the injunction. Karnoski, 926 F.3d at 1198 (quoting Sharp, 233 F.3d at 1170); see Pérez-Perdomo, 551 F.3d at 16.

HUD's motion to dissolve pointed to only one intervening change: THUD's enactment in February 2026. HUD argues that THUD both undermined the plaintiffs' legal claims and eliminated the threat of any irreparable harm to them while the case continued. Thus, according to HUD, THUD knocked out two of the legs supporting the preliminary injunctions. The district court disagreed. HUD has not convinced us that the court likely abused its discretion in so concluding.

**1. THUD's Impact on the Plaintiffs' APA Claims**

Beginning with the plaintiffs' legal claims, HUD makes two interrelated arguments about why the district court was wrong not to treat THUD as a "game changer." First, it maintains that THUD "expressly contemplat[es]" that HUD could award funds under "a fiscal year 2025 [NOFO]," but that the preliminary injunctions "thwart[]" its ability to do so. Second, it contends that THUD "confirm[s] that HUD has the authority and flexibility to modify or rescind the [24-25] NOFO and to issue a NOFO for 2025" well

after the MVA's three-month deadline for doing so, including in the waning days of 2025.[10] We disagree.

To begin, HUD ignores that it does have "a fiscal year 2025" NOFO in its hands. Indeed, the 24-25 NOFO, which is formally titled the "FY 2024 and FY 2025 Continuum of Care Competition," is just that. (Emphasis added.) The NOFO details a process for HUD to review CoC applications in 2025 and disburse funds in 2026, and it conditions "any FY 2025 funding [on] authoriz[ation] by a FY 2025 [c]ongressional [a]ppropriation." Although the 24-25 NOFO covered a two-year period (as authorized by Congress) to streamline the application process, it preserved discrete funding and application review protocols for each year. Indeed, it even established a separate August 2025 deadline for new grant applications and funding requests for projects ineligible for renewal. And categorizing the 24-25 NOFO as "a fiscal year 2025 NOFO" also makes sense in light of THUD's renewal scheme directing HUD either to (1) award funds under a 2025 NOFO (such as the 24-25 NOFO currently in place) or (2) noncompetitively renew grants for the remainder of this year. Thus, we do not see how HUD, even

[10] HUD also briefly suggests that the district court "did not even acknowledge [THUD]" in denying the motion to dissolve. That is incorrect. The district court expressly referenced "Congress['s]" action and held that it did not eliminate the irreparable harm faced by the plaintiffs or affect their likelihood of success on the merits.

under the preliminary injunctions, is "thwart[ed]" from "award[ing] 2025 funds under a 2025 NOFO."

Of course, HUD's goal is to enforce the December NOFO. So, we move to HUD's second argument: that THUD reaffirms its "authority and flexibility to modify or rescind the [24-25] NOFO and to issue a NOFO for 2025" even after the MVA's three-month deadline.[11]

HUD has not made a strong showing that its interpretation of THUD is correct. As usual, when tasked with interpreting a statute, we "must start with the text of the statute itself," aiming as best we can "to effectuate congressional intent." Teles de Menezes v. Rubio, 156 F.4th 1, 12 (1st Cir. 2025) (quoting City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020)). Unless the statute specifies otherwise, "we generally assume that the [text] carries its plain and ordinary meaning." City of Providence, 954 F.3d at 31.

The plain text of Section 244 does not support HUD's interpretation. Nothing in the text purports to amend the MVA itself or retroactively alter the deadline in the MVA for issuing a 2025 NOFO. The text of Section 244 simply permits the agency to award funds "under a fiscal year 2025 notice of funding

[11] In the stay motion filed in our Court, HUD does not identify which of the MVA's provisions were affected by THUD. We thus construe its arguments about THUD in light of the claims it raised in its motion to dissolve in the district court.

opportunity." § 244, 140 Stat. at 422 (emphasis added). Although HUD argues repeatedly that Section 244 allows it to issue a "new" 2025 NOFO, the word "new" is conspicuously missing from the text.

Even looking beyond Section 244 to the "surrounding . . . provision[s] and the structure of the statutory scheme as a whole," City of Providence, 954 F.3d at 31, we see no indication that Congress intended to discard the MVA deadline for issuing a 2025 NOFO. No other provision of THUD mentions a 2025 NOFO, let alone speaks to a modified timeline for issuing one.

In fact, other sections of THUD arguably reflect Congress's continued support for the deadlines set out by the MVA. In appropriating new CoC funds for 2026, Congress expressly directed HUD to issue a 2026 NOFO "not later than June 1, 2026." 140 Stat. at 400. Given that THUD became law on February 3, 2026, this timing largely aligns with the MVA's three-month deadline. And HUD makes no argument that by setting June 1 (as opposed to May 3) as the deadline for issuing a 2026 NOFO, Congress implicitly repealed the MVA deadline altogether or retroactively authorized HUD to issue a 2025 NOFO six months late.

Rather than authorizing a new 2025 NOFO, THUD appears to be aimed at avoiding funding gaps. For example, Section 244's text not only authorizes renewals for homeless-assistance projects set to expire but also requires HUD to adjust grant award amounts "to enable renewal projects to operate at substantially the same

levels." § 244, 140 Stat. at 423 (emphasis added). As we read THUD, the apparent thrust of the statute is to promote funding continuity, not disruption.

Further, certain provisions of THUD undermine HUD's position that Congress has endorsed the December NOFO. See City of Providence, 954 F.3d at 31 (explaining that "useful indicators of congressional intent" can be found in surrounding provisions). Critically, in establishing guidelines for the 2026 application cycle, the statute requires HUD to distribute funds by selecting projects "totaling not less than 60 percent of the [CoC] annual renewal demand" for Tier 1 funding. 140 Stat. at 399 (emphasis added). This requirement is at odds with the December NOFO, which sets a significantly lower cap of 30 percent on Tier 1 funding.

But even if we were to accept HUD's position that THUD waived the three-month deadline in the MVA for issuing the 2025 NOFO, that still would not be enough for HUD to make a strong showing that the district court abused its discretion in denying the motion to dissolve. In issuing the preliminary injunctions, the court cited multiple legal grounds for concluding that the November and December NOFOs were likely contrary to federal law; the MVA's three-month deadline was just one of those grounds. For example, the court also held that HUD's actions in rescinding the 24-25 NOFO and issuing the November NOFO likely violated several substantive requirements under the MVA, including Congress's

"prioritization of permanent housing and renewal stability" and its "formula-based allocations scheme." Notably, HUD did not contest these legal conclusions at the preliminary injunction stage, and it did not argue in its motion to dissolve that THUD undermined these conclusions.

The district court further held that HUD's actions were likely arbitrary and capricious in violation of the APA, as HUD had departed from longstanding policy and failed to consider the significant reliance interests of key stakeholders in doing so on a truncated timeline. And the court concluded that HUD likely erred in adopting "sweeping new grant conditions without required notice and comment." Each of these conclusions constituted an independent basis for the district court's ruling that the plaintiffs were likely to succeed on the merits of their APA claims. And none are at issue in this appeal.[12]

In sum, HUD has argued that THUD undermined only one aspect of the district court's APA analysis: the impact of the MVA's three-month deadline. That means we have no occasion to evaluate the rest of the district court's APA analysis. See Karnoski, 926 F.3d at 1198; Hoult, 373 F.3d at 53. Thus, we conclude that HUD has failed to make a strong showing that the

[12] HUD may, of course, challenge these conclusions to the extent they are reflected in the district court's final judgment. But as of now, the summary judgment motions are still pending, and the district court has not yet issued its final ruling.

district court likely abused its discretion in declining to dissolve the preliminary injunctions because of THUD's impact on the plaintiffs' APA claims.

**2. THUD's Impact on the Plaintiffs' Irreparable Harm**

HUD also argues that the district court should have dissolved the preliminary injunctions because THUD eliminates any risk of "immediate, irreparable harm" to the plaintiffs. It maintains that THUD's provision for staggered grant renewals effectively ensures that the plaintiffs will not face a funding gap before July 1, 2026, alleviating their need for interim relief while this case proceeds.[13]

The plaintiffs vigorously dispute HUD's argument. Relying on evidence they submitted in opposition to HUD's motion to dissolve, they maintain that they would face irreparable harm if HUD were permitted to begin implementing the December NOFO in the coming weeks, even with THUD in place. And the district court agreed with the plaintiffs in denying the motion to dissolve.

The record certainly supports the district court's conclusion. It indicates that CoC funding recipients face a fundamental timing problem: They must make long-term decisions today -- such as renewing leases, retaining personnel, and

[13] As a reminder, THUD provides for automatic funding renewals in the first quarter of 2026, and HUD has represented that it will automatically renew funding set to expire in the second quarter as well.

accepting new residents -- based on projections of funding months down the road. Because they anticipate losing funding under the December NOFO, CoC recipients would be forced to "close[] or . . . prepar[e] to" close their programs immediately if HUD were permitted to implement that NOFO now, even if that NOFO were ultimately ruled invalid at final judgment. See Francisco Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo before the merits have been resolved.").

HUD nonetheless insists that simply "invit[ing] applications under the new NOFO" would not risk any irreparable harm to the plaintiffs. Critically, HUD failed to raise this point in its stay motion to the district court, and it is thus waived. See Am. Hosp. Ass'n v. Kennedy, 164 F.4th 28, 36 (1st Cir. 2026) (declining to consider arguments not developed in a motion for a stay in the district court). But in any event, the record reflects that given their severe resource constraints, CoC funding recipients would face immediate, irreparable harm from the diversion of resources required to respond to two separate CoC funding competitions within a two-month period (that is, the December NOFO that HUD seeks to open in early April 2026, and the fiscal year 2026 NOFO that, under THUD, must be released by June 1, 2026). See 140 Stat. at 400.

Thus, HUD has not made a strong showing that it is likely to succeed on the merits of its appeal challenging the district court's denial of its motion to dissolve. And for that reason alone, its stay request is doomed. See R.I. State Council of Churches v. Rollins, 158 F.4th 304, 312 (1st Cir. 2025) ("If the government fails to make a strong showing that it is likely to succeed on the merits, 'the remaining elements are of little consequence.'" (quoting Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020))).

**C. Remaining Stay Factors**

We nevertheless briefly address HUD's arguments on the remaining three Nken stay factors. HUD claims that it faces irreparable harm absent a stay because after April 1, 2026, it will be unable to meet the July 1, 2026 award deadline established by THUD for the third and fourth quarters. As a result, HUD maintains that the preliminary injunctions prevent it from "effectuating [a] statute[] enacted by representatives of [the] people," amounting to irreparable harm. (Quoting Trump v. CASA, Inc., 606 U.S. 831, 861 (2025).)

HUD's argument fails for multiple reasons. First, as we have explained, the preliminary injunctions do not prevent HUD from awarding CoC funds under a 2025 NOFO, as contemplated by THUD. Indeed, HUD may readily award funds pursuant to the 24-25

NOFO -- which is a 2025 NOFO -- and thus "effectuat[e]" the funding schedule provided under THUD.

Second, although HUD cannot enforce the December NOFO while the litigation proceeds, irreparable harm does not arise from a preliminary injunction that prohibits an agency from taking action that is likely unlawful. See Doe v. Trump, 157 F.4th 36, 79 (1st Cir. 2025), petition for cert. filed, No. 25-899 (U.S. Jan. 30, 2026). The district court found that HUD likely violated the APA in issuing the December NOFO. Because HUD failed to challenge much of the court's APA analysis in its motion to dissolve, we must accept the court's conclusions on those issues for the purposes of this appeal. See Karnoski, 926 F.3d at 1198; Hoult, 373 F.3d at 53. We thus find no basis to conclude that HUD would be irreparably harmed absent a stay.

As for the risk of substantial injury to the interested parties and where the public interest lies, HUD has failed to dispute many of the "immediate, predictable" harms that would flow to the plaintiffs and their constituents if the preliminary injunctions were lifted.[14] R.I. State Council of Churches, 158

[14] In its motion filed in our Court, HUD made a single argument that a stay would not cause irreparable harm to the plaintiffs. Above, we addressed this irreparable harm argument as part of our analysis of whether HUD has made a strong showing of likelihood of success on the merits of its appeal. Although Nken's third prong requires us to evaluate only if harm to interested parties will be "substantial[]," not irreparable, we construe HUD's argument

F.4th at 316. Nor can it do so on this record. To recap, the plaintiffs submitted uncontested evidence that allowing HUD to enforce the December NOFO would wreak havoc: In anticipation of potential funding cuts, housing programs and support services would be ended or drastically curtailed, personnel would be laid off, and relationships with local housing and service providers would be ruined.

And of course, the plaintiffs submitted ample evidence that any implementation of the December NOFO would be immediately destabilizing and disastrous for their constituents. One CoC-funded program in Massachusetts that administers housing for nearly 600 formerly homeless households reported that it would "not continue running [its] program" if HUD proceeded with the December NOFO "due to the [funding] uncertainty" that it threatens. Other housing organizations similarly stated that they would not "add new participants now if they w[ould] need to end programs in mere months." And another nonprofit in Tennessee that serves domestic-violence survivors reported that it would "hav[e] to stop providing services as of June 30, 2026," if the December NOFO were implemented before then. These on-the-ground warnings, and the dozens of others documented in the record, demonstrate that a stay

---

liberally in conducting our analysis under Nken's equitable factors. 556 U.S. at 434 (quoting Hilton, 481 U.S. at 776).

would have immediate and "devastating impacts" on the plaintiffs and the people they serve.

HUD's only response to this evidence is to argue that the identified harms are not "independent" from the plaintiffs' claims on the merits and thus should be discounted. We fail to see how that is so. The harms -- such as the shuttering of housing organizations, loss of relationships with housing and service providers, and loss of one's housing -- would manifest from a stay irrespective of the legality of the December NOFO.

HUD's citation to Charlesbank Equity Fund II v. Blinds To Go, Inc. does not persuade us otherwise. See 370 F.3d 151 (1st Cir. 2004). In that case, we concluded that an investment fund seeking a preliminary injunction failed to "show a meaningful risk of irreparable harm" in a breach of contract suit. Id. at 162. The plaintiff cited only the defendant's use of its funds, and the related "risk that [it] w[ould] be left with nothing," as the harm that it would suffer absent relief. Id. at 162-63 (first alteration in original). We held that harm insufficient because it could be readily cured through an award of money damages. See id. at 163.

To start, Charlesbank is off-point because the plaintiff there had the burden to show that it would suffer irreparable harm, whereas the third and fourth Nken stay factors require us to consider only any "substantial[]" harm to the plaintiffs and the

"interest[s]" of the "public." 556 U.S. at 434 (quoting Hilton, 481 U.S. at 776). Indeed, under Nken, it is HUD that must demonstrate that it will be irreparably harmed without a stay. See id.

In any event, the landscape of this case is worlds apart from that in Charlesbank. The record here is replete with evidence that dissolving the injunctions would result in wide-ranging and severe consequences as the litigation plays out. And those harms would not be readily curable after the fact; indeed, a final judgment in the plaintiffs' favor would offer little solace to those residents who may be forced into homelessness in the interim.

In sum, the record paints a disturbing picture of the harms that would flow to the plaintiffs, their constituents, and the public from issuing a stay. Conversely, HUD does not face irreparable harm from injunctions "bar[ring] enforcement of an unlawful" NOFO. Doe, 157 F.4th at 79. Thus, we conclude that HUD has failed to show that the remaining Nken factors support the extraordinary relief of a stay.

## IV. CONCLUSION

For all these reasons, we **deny** HUD's motion for a stay pending appeal.